

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
:
MANZOOR QADAR,                                                     :  13-CV-2967 (ARR)
                                                                   :
                           Petitioner,                             :  <u>NOT FOR ELECTRONIC</u>
                                                                   :  <u>OR PRINT PUBLICATION</u>
      -against-                                                    :
                                                                   :  <u>OPINION & ORDER</u>
UNITED STATES OF AMERICA,                                          :
                                                                   :
                           Respondent.                             :
                                                                   :
------------------------------------------------------------------ X
ROSS, United States District Judge:

      Petitioner Manzoor Qadar, proceeding <u>pro se</u>, moves to vacate his conviction pursuant to 28 U.S.C. § 2255. Petitioner raises several ineffective-assistance-of-counsel claims and, primarily in a supplemental filing, argues that he is actually innocent of the crimes of which he was convicted before this court. For the reasons set forth below, I find that Qadar's petition is untimely and that petitioner has failed to set forth grounds to overcome this bar. Accordingly, the petition is denied.

## BACKGROUND

### I.    <u>Petitioner's Trial and Conviction</u>

      On April 17, 2002, a jury found petitioner guilty of murder-for-hire and conspiracy to commit murder-for-hire, in violation of 18 U.S.C. § 1958, and using a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c).[1] Petitioner's conviction related to the November 1996 murder of Shaukat Parvez ("Shaukat"), a Pakistani immigrant who

---

[1] Unless otherwise noted, the facts in this section and the following sections are taken from this court's order dated May 7, 2003, denying petitioner's Rule 33 motion in his underlying criminal case. <u>See</u> <u>United States v. Quadar</u>, No. 00-CR-603 (ARR), DE #88.

1

was shot near his home in Queens, New York. At trial, the government established that petitioner had conspired with others, including Omar Malik, to commit the murder.

The murder victim, Shaukat, had secretly married Rubina Malik Parvez ("Rubina"), the daughter of an influential Pakistani businessman named Malik Rahmet Khan ("Rahmet"), against her father's wishes. Rahmet had arranged for Rubina to marry another man, Khurram Khan ("Khan"). After her secret marriage to Shaukat, Rubina was forced to marry Khan, to whom she at some point disclosed her secret marriage to Shaukat. Shaukat was, by that point, living in the United States. Eventually, Rubina and Khan both fled to the United States, where Rubina reunited with Shaukat and settled in Queens.

After Rahmet learned of Rubina's marriage to Shaukat, he began conspiring with his son Omar Malik ("Omar"), who was also living in the United States at the time, to kill Shaukat, Rubina, and Khan. Another of Rahmet's sons, Malik Qamar Islam ("Qamar") overheard telephone conversations between his father and Omar, including one in which they discussed paying someone $60,000 to commit the murder. Rahmet instructed Qamar to kill several of Shaukat's family members living in Pakistan, but Qamar did not do so and instead warned his sister by phone of the danger to her and Shaukat.

On September 16, 1996, Omar went to Shaukat's and Rubina's home late at night and tried to speak with them, but they refused to see him. Omar also called them by phone that night, but Shaukat told Omar that they did not want to speak to him. Two days later, Shaukat and Rubina filed a complaint against Omar with the New York City Police Department, in which they alleged that Omar had threatened to kill Shaukat because of his relationship with Rubina.

On November 15, 1996, petitioner flew from Manchester, England, to New York using a ticket that he had purchased in cash the day before for twice his weekly salary. In New York, Omar introduced petitioner to Abdul Qazi and asked to borrow Qazi's car because, Omar told Qazi, Shaukat had seen Omar and petitioner in Omar's own car, a white Ford Taurus station wagon. The next day, Omar told Qazi that he and petitioner had found Shaukat and that "they" were going to "teach him a lesson," which Qazi understood to mean that "something bad" would happen to Shaukat.

Shaukat was shot and killed on November 22, 1996. Two eyewitnesses observed a white van or station wagon chase him around a corner while a gunman fired at him from the passenger side of the vehicle. After the murder, Omar and petitioner drove through the night to northern Virginia, where petitioner caught a flight from Dulles International Airport back to England. Omar fled to Canada with the help of a cousin and was eventually arrested on charges related to this case after his return to Pakistan. However, he subsequently absconded.

Qamar testified at trial that, at some point after the murder, Omar told him over the phone that he had "killed Shaukat in America." According to Rubina's trial testimony, Omar told her that he did not kill Shaukat but that Rahmet had paid someone else to do it. At trial, the government also introduced a tape-recorded conversation in which petitioner instructed his wife about what to do with a sum of money that he had obtained in November 1996 and did not want others to know about.

Another witness at petitioner's trial testified that petitioner had once mediated a dispute involving a daughter who had run away with a non-Muslim against her family's wishes. In summation, petitioner's trial counsel highlighted this prior incident and suggested that Qadar had

3

come to New York in 1996 to perform a similar role in mediating between Rubina and her family.

## II. Petitioner's Rule 33 Motion

At trial, petitioner was represented by retained counsel Alexei M. Schacht, Esq. Following trial, at petitioner's request, Schacht was replaced by new retained counsel, Uzmah Saghir. Saghir represented Qadar in requesting a new trial, as well as at his sentencing and on direct appeal.

On March 28, 2003, prior to sentencing, petitioner filed a motion, through counsel, for a new trial pursuant to Rule 33 of the Federal Rules of Civil Procedure. In his motion, plaintiff argued that newly-discovered evidence confirmed the theory, offered by counsel at trial, that he had traveled to New York to mediate the family dispute and was completely innocent of Shaukat's murder. The newly-discovered evidence submitted by Qadar in connection with that motion, which is the same evidence that he principally relies on in his instant § 2255 petition, consisted of the declarations of Nishat Bashir ("Nishat") and Raqia Bashir ("Raqia"), both of whom were located in the United Kingdom and, in their declarations, expressed their willingness to testify on Qadar's behalf in the future.

Nishat, who married Omar in 1998, claimed that on several occasions she had heard Rahmet praise Omar for having killed Shaukat in defense of the family's honor. She also claimed that, after their marriage, Omar told her that he believed Shaukat was armed when he encountered him and that he had shot Shaukat because he thought Shaukat had made a move for his weapon. Nishat also declared that Omar told her that he had asked Qadar to accompany him as a mediator when he visited Shaukat, as Qadar and Shaukat were first cousins with a good

4

relationship, and that Qadar had no idea that he would shoot Shaukat. Nishat claimed that she did not come forward with this information sooner because Omar had directed her never to repeat it to anyone.

Raqia, Rahmet's sister, declared that she visited Omar in 1999 and that he told her a version of events similar to what he purportedly told Nishat. She claimed that Omar told her that petitioner never entered into an agreement to kill Shaukat and that petitioner played no role in the killing except being present. She also stated that Omar had told her that no payment was ever made to petitioner for his efforts to mediate for the family. She asserted that she had not previously come forward with this information because Rahmet threatened to kill her if she told federal investigators.

This court denied petitioner's Rule 33 motion primarily on the basis that the portions of the new evidence purporting to exonerate petitioner were inadmissible hearsay not subject to an exception under the Federal Rules of Evidence. Specifically, Omar's out-of-court statements regarding petitioner's participation in, and knowledge of, the murder were not against Omar's penal interest and were not corroborated for trustworthiness---in fact, they contradicted the identical accounts of two eyewitnesses who testified about the circumstances of the shooting.

### III. Sentencing and Motion for Reconsideration

On June 10, 2003, this court sentenced petitioner to two concurrent terms of life imprisonment for his murder for hire and murder-for-hire conspiracy convictions and a consecutive five-year term of imprisonment for his firearm conviction. Tr. of Sentencing, United States v. Quadar, No. 00-CR-603 (ARR), DE #91, at 11, 13. Immediately prior to sentencing, this court addressed petitioner's motion, which had been filed the day before, requesting

5

reconsideration of the Rule 33 motion on the basis of two additional declarations from Gulzamir Ahmed, apparently a family friend, and Malik Camron Nasir,[2] petitioner's relative, claiming that petitioner was not involved in the murder.[3]

In his declaration, which is the only one of these two now attached to Qadar's instant petition, Gulzamir Ahmed stated that, on a visit to Pakistan in 1999, Rahmet had told Gulzamir Ahmed that it had been Rahmet's intention to use petitioner as bait to lure Shaukat out for Omar to kill him. DE #19-1, ¶¶ 15, 17. According to Gulzamir Ahmed, "[Rahmet] said he had spoken to [petitioner] a few times on the telephone trying to get him to go to New York so that Omar can get a clear shot at [Shaukat]." Id. ¶ 16. Gulzamir Ahmed also stated that Rahmet had told him that he had asked petitioner to go to New York to help him handle the situation and that petitioner did not know that Omar was going to kill Shaukat until it happened. Id. ¶ 17. Gulzamir Ahmed, who was also located in the United Kingdom but expressed his willingness to testify, stated that he had not previously come forward because he "had faith in the Legal System of a county [sic] like the USA." Id. ¶ 18.

Although petitioner has not submitted Nasir's declaration in connection with his petition, the transcript of petitioner's sentencing describes some of its content. Nasir apparently stated that petitioner was at some point held hostage in Pakistan by the Malik family for four months and that she had heard that Rahmet had told petitioner that he would pay for his plane ticket to the United States, which directly contradicted the statement in Raqia's affidavit. Tr. 5.

---

[2] Documents from petitioner's underlying criminal case refer to her as Malik Camron Nasir, but petitioner's papers refer to her as Malik Camron Neyes. For simplicity, the court will use Nasir.

[3] Petitioner also relies on this evidence in his instant petition. However, he has only attached the declaration of Gulzamir Ahmed to the petition. Although he cites the declaration of Malik Camron Nasir (or Neyes) in his "Supplemental/Amended Motion," DE #19, at 19, he has not attached it to the petition.

This court denied petitioner's request for reconsideration of his Rule 33 motion for substantially the same reasons as stated in the initial order denying the motion, and principally on the grounds that the purportedly exculpatory statements were composed entirely of inadmissible hearsay. Tr. 8-9. The court also noted that "the first set of affidavits [submitted with the Rule 33 motion] . . . was basically inconsistent with the second set of affidavits," id. at 7, and that they were "inherently incredible," id. at 9.

## IV. <u>Direct Appeal</u>

Plaintiff appealed his conviction and sentence arguing, through counsel, that (1) there was insufficient evidence to convict him; (2) his sentence exceed the statutory maximum; and (3) his sentence violated the holding of <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000). On March 16, 2007, the Second Circuit summarily affirmed petitioner's conviction and sentence and rejected each of his arguments. <u>United States v. Quadar</u>, 223 F. App'x 22 (2d Cir. 2007). The Supreme Court denied Qadar's petition for <u>certiorari</u> on October 1, 2007. <u>Qadar v. United States</u>, 552 U.S. 870 (2007).

## V. <u>The Instant Petition</u>

On May 7, 2013, acting <u>pro se</u>, petitioner filed a "writ of error audita querrla [sic]" pursuant to the All Writs Act, 28 U.S.C. § 1651, which Qadar explicitly indicated was not intended to serve as a § 2255 petition. DE #1. This court denied that petition for on June 5, 2013, and gave petitioner 30 days to file a petition pursuant to § 2255. DE #5. Because petitioner had not submitted a § 2255 petition with the 30-day period, judgment was entered dismissing his case on July 8, 2013. DE #7. On August 7, 2013, petitioner filed a motion

seeking reconsideration and additional time to file his § 2255 petition, DE #8, which the court granted, DE #9.

On September 30, 2013, the court received Qadar's § 2255 petition.[4] DE #10 ("Initial Petition). In his Initial Petition, Qadar argued that his trial counsel was ineffective for (1) advising him to proceed to trial rather than plead guilty; (2) failing to relay to petitioner a 24-month plea offer; and (3) advising petitioner to appear before the jury in full beard and Islamic attire at a time that was only a few months after the 9/11 terrorist attacks in New York City. Qadar contended that "ineffective counsel while being presumed innocent makes petitioner still actually innocent." Id. at ECF 15.

Qadar subsequently moved to "amend/correct/supplement" his petition, DE #12, and his "Amended/Supplemental" petition was filed on February 14, 2014, DE #19 ("Amended Petition"). In his Amended Petition, Qadar principally argued that he was actually innocent based on the insufficiency of the evidence at trial and on the "new evidence," i.e., the four declarations that were submitted in connection with his Rule 33 and reconsideration motions. Petitioner also argued that his trial counsel's failure to investigate or call these new potential witnesses who provided the affidavits constituted ineffective assistance of counsel. In support of his arguments, he attached as exhibits the earlier declarations from Nishat, Raqia, and Gulzamir Ahmed. He argued that, although filed after the expiration of the one-year statute of limitations, his petition should not be treated as time-barred because the new evidence demonstrates his actual innocence.

---

[4] Qadar's petition was attached to a letter from a correctional counselor at the facility where petitioner was incarcerated indicating that petitioner had tried to mail the petition on August 28, 2013, but it had been returned as undeliverable.

# DISCUSSION

## I. Statute of Limitations

A federal habeas petition is subject to a one-year statute of limitations, which begins to run on "the date on which the judgment of conviction becomes final."[5] 28 U.S.C. § 2255(f). "[A] prisoner's conviction becomes final . . . when the United States Supreme Court denies the prisoner's petition for a writ of certiorari." Green v. United States, 260 F.3d 78, 84 (2d Cir. 2001); accord Clay v. United States, 537 U.S. 522, 527 (2003).

The Supreme Court denied Qadar's petition for certiorari on October 1, 2007. Even the earliest conceivable date on which Qadar might be considered to have filed his § 2255 petition, the date on which he filed his petition for a writ of audita querela, was not until well over five years later. Accordingly, in the absence of circumstances warranting tolling or some other exception to the one-year limitations period, the petition must be dismissed as untimely.

## II. Equitable Tolling

Only "rare and exceptional circumstances warrant equitably tolling the limitations period" for a § 2255 petition. Green, 260 F.3d at 82-83 (internal quotation mark omitted). A habeas petitioner is "entitled to equitable tolling only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and

---

[5] The statute of limitations will also run from, if later, "(2) the date on which the impediment for making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action; (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2255(f). There is no basis for grounds (2) or (3) to apply here. To the extent that plaintiff brings his petition based on the "new evidence" of the affidavits, those facts were available to petitioner at the latest by the time of his sentencing when they were provided to the court. Accordingly, ground (4) is of no help to petitioner, as his conviction did not become final until after the date on which he was aware of the evidence underlying his petition.

prevented timely filing." Holland v. Florida, 560 U.S. 631, 649 (2010) (quoting Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005)) (internal quotation marks omitted).

In this instance, petitioner has not alleged any facts that would create a basis for equitable tolling. He has not shown that he has been "pursuing his rights diligently," or even at all, since the date that the Supreme Court denied certiorari. Nor has he demonstrated the existence of any extraordinary circumstances that prevented him from timely filing. Consequently, Qadar cannot benefit from equitable tolling of the limitations period for his petition.

## III. Actual Innocence

In his Amended Petition, Qadar asserts that he is actually innocent of the crimes of which he was convicted. Consequently, he argues that, pursuant to the Supreme Court's decision in McQuiggin v. Perkins, 133 S. Ct. 1924 (2013), his petition should not be barred as untimely. Although a showing of "actual innocence" may open a "gateway" to consideration of an otherwise time-barred habeas petition, id. at 1928, petitioner has not met the "demanding" standard for such a showing in this case, House v. Bell, 547 U.S. 518, 538 (2006).

In McQuiggin, the Supreme Court recognized that the actual innocence gateway to federal habeas review developed in Schlup v. Delo, 513 U.S. 298 (1995), and House, 547 U.S. 518, extends to cases where the petition would otherwise be barred by the expiration of the one-year statute of limitations prescribed by the Antiterrorism and Effective Death Penalty Act of 1998 ("AEDPA").[6] This "miscarriage of justice" exception applies only to cases "where a

---

[6] The Second Circuit had previously reached the same conclusion in Rivas v. Fischer, 687 F.3d 514, 540, 548 (2d Cir. 2012). McQuiggin and Rivas considered the statute of limitations in 28 U.S.C. § 2241(d)(1), which applies to habeas petitions filed by state prisoners. Because the limitations language of 28 U.S.C. § 2255(f) is nearly identical and the reasoning of those cases is equally applicable in this context, the court assumes that the actual innocence exception would be available to a § 2255 petitioner who satisfies its stringent standard. Cf. Bousley v. United States, 523 U.S. 614, 623 (1998) (holding that a § 2255 petitioner who has procedurally defaulted a claim by failing

constitutional violation has probably resulted in the conviction of one who is actually innocent." Rivas v. Fischer, 687 F.3d 514, 540 (2d Cir. 2012) (quoting Murray v. Carrier, 477 U.S. 478, 496 (1986)). In McQuiggin, the Supreme Court cautioned that "tenable actual-innocence gateway pleas are rare." 133 S. Ct. at 1928. "The gateway should open only when a petition presents 'evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.'" Id. at 1936 (quoting Schlup, 513 U.S. at 316).

To meet this stringent standard, a petitioner's claim of actual innocence "must be both 'credible' and 'compelling.'" Rivas, 687 F.3d at 541 (quoting House, 547 U.S. at 521, 538). "For the claim to be 'credible,' it must be supported by new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence––that was not presented at trial." Id. (internal quotation marks and citation omitted). "For the claim to be 'compelling,' the petitioner must demonstrate that 'more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt––or to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt.'" Id. (quoting House, 547 U.S. at 538). A petitioner must at least "introduce credible new evidence that thoroughly undermines the evidence supporting the jury's verdict." Id. at 543.

In applying this standard, courts must "consider all the evidence, old and new, incriminating and exculpatory" and "make a probabilistic determination about what reasonable, properly instructed jurors would do." House, 547 U.S. at 538 (internal quotation marks omitted).

---

to raise it on direct review may raise that claim in his habeas petition if he can first demonstrate that he is "actually innocent").

"If new evidence so requires, this may include consideration of the credibility of the witnesses presented at trial." Id. at 538-39 (internal quotation marks omitted). A court may also consider "[u]nexplained delay in presenting new evidence" as a factor in making its determination. McQuiggin, 133 S. Ct. at 1935.

Here, having reviewed the record as a whole, including the declarations resubmitted by petitioner, the court finds petitioner's actual innocence claim neither credible nor compelling. Foremost, the "new" evidence relied on by Qadar is not the kind of "new reliable evidence" required to make a viable showing of credibility. As discussed in this court's prior rulings related to petitioner's Rule 33 motion, the exculpatory portions of the "new" declarations consist of hearsay statements lacking in indicia of reliability. These are not "trustworthy eyewitness accounts" or firsthand alibi witnesses. Although signed and dated, none of the declarations are sworn or notarized. The fact that petitioner's "new evidence" consists entirely of hearsay statements may not, alone, be determinative, but it is a factor that weighs against the reliability of the evidence.

In addition to primarily containing hearsay, the timing of these affidavits is highly suspect. Despite petitioner arguably having had ample opportunity to investigate any information that these witnesses had prior to trial, all four declarations were provided only after petitioner was convicted, and the second set only after this court made a ruling unfavorable to petitioner. Moreover, the facts in the second set of affidavits were neatly tailored to address precisely the issues that the court had raised with respect to the first set of affidavits. The declarants' purported reasons for failing to come forward sooner range from mildly plausible---fear of the Malik family that was only overcome after petitioner's conviction---to completely feckless---"faith in the Legal System of a county [sic] like the USA."

12

Not only are these affidavits inconsistent with each other, they are, more importantly, inconsistent with the sworn testimony at trial of two independent eyewitnesses who saw two persons acting together to kill Shaukat and with the corroborating circumstantial evidence adduced by the government. The eyewitness testimony that one individual drove the car chasing after Shaukat while the other individual shot at Shaukat from the passenger side of the vehicle is nearly impossible to reconcile with a version of events in which petitioner was merely a bystander, present only to play a mediation role, without any knowledge of, or active role in, the murder of Shaukat. The two eyewitnesses' version of events is also inconsistent with the account that Omar purportedly gave to Nishat and Raqia, in which Qadar stood by passively while Omar drew his weapon in panic and impulsively shot Shaukat. As this court stated in its Rule 33 denial order, "the fact that [these statements] have no support in the record casts fatal doubt on their reliability." United States v. Quadar, No. 00-CR-603 (ARR), DE #88, at 10.

With respect to the second prong of the actual innocence analysis, even assuming that petitioner's asserted evidence were new, credible, and could be admissible at trial, it is not so compelling as to lead to the conclusion that "more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt." House, 547 U.S. at 538. As already explained, the additional declarations are inconsistent with the more reliable firsthand accounts of eyewitnesses to Shaukat's murder who, unlike Qadar's family friends and relatives, are less likely to have motives for their accounts. Moreover, those eyewitnesses' accounts are corroborated by circumstantial evidence offered against petitioner at trial, including petitioner's overnight retreat to Virginia with Omar, his attempts to hide his trip to the United States from his family as well as from authorities, his flight from the United Kingdom to the Netherlands, and his recorded conversation with his wife about money that he had received in 1996 that he did not

13

want others to know about. Although the court acknowledges the seeming unfairness of only petitioner's incarceration while the ostensibly more culpable parties, Rahmet and Omar, still remain free and at large, petitioner's proffered evidence is simply not so compelling as to undermine the court's confidence in the outcome of the trial and suggest that a fundamental miscarriage of justice will be worked if his habeas petition is dismissed as time-barred.

Because petitioner has failed to show that the actual innocence exception should apply in his case, his petition must be treated as untimely and, accordingly, denied.

## CONCLUSION

For the foregoing reasons, petitioner's motion to vacate his conviction and sentence under 28 U.S.C. § 2255 is denied as time-barred. Furthermore, because petitioner has not made a "substantial showing of the denial of a constitutional right" pursuant to 29 U.S.C. § 2253(c)(3), no Certificate of Appealability will issue. Petitioner may seek such a certificate from the Second Circuit Court of Appeals. The Clerk of Court is directed to enter judgment accordingly.

SO ORDERED.

/S/ Judge Allyne R.
_____
Allyne R. Ross
United States District Judge

Dated: July 28, 2014
Brooklyn, New York

**SERVICE LIST**

**Manzoor Qadar**
# 6047674-053
FCI Otisville
Satellite Camp
P.O. Box 1000
Otisville, NY 10963