UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X
                                                                    :
MANZOOR QADAR,                                                      :        13-CV-2967 (ARR)
                                                                    :
                              Petitioner,                           :        <u>NOT FOR ELECTRONIC</u>
                                                                    :        <u>OR PRINT PUBLICATION</u>
     -against-                                                      :
                                                                    :        <u>OPINION & ORDER</u>
UNITED STATES OF AMERICA,                                           :
                                                                    :
                              Respondent.                           :
                                                                    :
------------------------------------------------------------------- X

ROSS, United States District Judge:

       Petitioner Manzoor Qadar, proceeding <u>pro se</u>, moves to vacate his conviction pursuant to

28 U.S.C. § 2255. The petition may be construed as raising several ineffective-assistance-of-

counsel claims and an insufficiency of the evidence claim, as well as arguments that petitioner is

actually innocent of the crimes of which he was convicted before this court. For the reasons set

forth below, I find that Qadar's petition is without merit. Accordingly, the petition is denied.

## BACKGROUND

## I.    <u>Petitioner's Trial and Conviction</u>

       On April 17, 2002, a jury found petitioner guilty of murder-for-hire and conspiracy to

commit murder-for-hire, in violation of 18 U.S.C. § 1958, and using a firearm during and in

relation to a crime of violence, in violation of 18 U.S.C. § 924(c).[1]  Petitioner's conviction

related to the November 1996 murder of Shaukat Parvez ("Shaukat"), a Pakistani immigrant who

---

[1] Unless otherwise noted, the facts in this section and the following sections are taken from this court's order dated
May 7, 2003, denying petitioner's Rule 33 motion in his underlying criminal case. <u>See</u> <u>United States v. Quadar</u>, No.
00-CR-603 (ARR), DE #88.

was shot near his home in Queens, New York. At trial, the government established that petitioner had conspired with others, including Omar Malik, to commit the murder.

The murder victim, Shaukat, had secretly married Rubina Malik Parvez ("Rubina"), the daughter of an influential Pakistani businessman named Malik Rahmet Khan ("Rahmet"), against her father's wishes. Rahmet had arranged for Rubina to marry another man, Khurram Khan ("Khan"). After her secret marriage to Shaukat, Rubina was forced to marry Khan, to whom she at some point disclosed her secret marriage to Shaukat. Shaukat was, by that point, living in the United States. Eventually, Rubina and Khan both fled to the United States, where Rubina reunited with Shaukat and settled in Queens.

After Rahmet learned of Rubina's marriage to Shaukat, he began conspiring with his son Omar Malik ("Omar"), who was also living in the United States at the time, to kill Shaukat, Rubina, and Khan. Another of Rahmet's sons, Malik Qamar Islam ("Qamar") overheard telephone conversations between his father and Omar, including one in which they discussed paying someone $60,000 to commit the murder. Rahmet instructed Qamar to kill several of Shaukat's family members living in Pakistan, but Qamar did not do so and instead warned his sister by phone of the danger to her and Shaukat.

On September 16, 1996, Omar went to Shaukat's and Rubina's home late at night and tried to speak with them, but they refused to see him. Omar also called them by phone that night, but Shaukat told Omar that they did not want to speak to him. Two days later, Shaukat and Rubina filed a complaint against Omar with the New York City Police Department, in which they alleged that Omar had threatened to kill Shaukat because of his relationship with Rubina.

On November 15, 1996, petitioner flew from Manchester, England, to New York. In New York, Omar introduced petitioner to Abdul Qazi and asked to borrow Qazi's car because, Omar told Qazi, Shaukat had seen Omar and petitioner in Omar's own car, a white Ford Taurus station wagon. The next day, Omar told Qazi that he and petitioner had found Shaukat and that "they" were going to "teach him a lesson."

Shaukat was shot and killed on November 22, 1996. Two eyewitnesses observed a white van or station wagon chase him around a corner while a gunman fired at him from the passenger side of the vehicle. After the murder, Omar and petitioner drove through the night to northern Virginia, where petitioner caught a flight from Dulles International Airport back to England. Omar fled to Canada with the help of a cousin and was eventually arrested on charges related to this case after his return to Pakistan. However, he subsequently absconded.

Qamar testified at trial that, at some point after the murder, Omar told him over the phone that he had "killed Shaukat in America." According to Rubina's trial testimony, Omar told her that he did not kill Shaukat but that Rahmet had paid someone else to do it. At trial, the government also introduced a tape-recorded conversation in which petitioner instructed his wife about what to do with a sum of money that he had obtained in November 1996 and did not want others to know about.

Another witness at petitioner's trial testified that petitioner had once mediated a dispute involving a daughter who had run away with a non-Muslim against her family's wishes. In summation, petitioner's trial counsel highlighted this prior incident and suggested that Qadar had come to New York in 1996 to perform a similar role in mediating between Rubina and her family.

3

## II.    Petitioner's Rule 33 Motion

At trial, petitioner was represented by retained counsel Alexei M. Schacht, Esq.
Following trial, at petitioner's request, Schacht was replaced by new retained counsel, Uzmah
Saghir.  Saghir represented Qadar in requesting a new trial, as well as at his sentencing and on
direct appeal.

On March 28, 2003, prior to sentencing, petitioner filed a motion, through counsel, for a
new trial pursuant to Rule 33 of the Federal Rules of Civil Procedure.  In his motion, plaintiff
argued that newly-discovered evidence confirmed the theory, offered by counsel at trial, that he
had traveled to New York to mediate the family dispute and was completely innocent of
Shaukat's murder.  The newly-discovered evidence submitted by Qadar in connection with that
motion, which is the same evidence that he principally relies on in his instant § 2255 petition,
consisted of the declarations of Nishat Bashir ("Nishat") and Raqia Bashir ("Raqia"), both of
whom were located in the United Kingdom and, in their declarations, expressed their willingness
to testify on Qadar's behalf in the future.

Nishat, who married Omar in 1998, claimed that on several occasions she had heard
Rahmet praise Omar for having killed Shaukat in defense of the family's honor.  She also
claimed that, after their marriage, Omar told her that he believed Shaukat was armed when he
encountered him and that he had shot Shaukat because he thought Shaukat had made a move for
his weapon.  Nishat also declared that Omar told her that he had asked Qadar to accompany him
as a mediator when he visited Shaukat, as Qadar and Shaukat were first cousins with a good
relationship, and that Qadar had no idea that Omar would shoot Shaukat.  Nishat claimed that she

did not come forward with this information sooner because Omar had directed her never to repeat it to anyone.

Raqia, Rahmet's sister, declared that she visited Omar in 1999 and that he told her a version of events similar to what he purportedly told Nishat. She claimed that Omar told her that petitioner never entered into an agreement to kill Shaukat and that petitioner played no role in the killing except being present. She also stated that Omar had told her that no payment was ever made to petitioner for his efforts to mediate for the family. She asserted that she had not previously come forward with this information because Rahmet threatened to kill her if she told federal investigators.

This court denied petitioner's Rule 33 motion primarily on the basis that the portions of the new evidence purporting to exonerate petitioner were inadmissible hearsay not subject to an exception under the Federal Rules of Evidence. Specifically, Omar's out-of-court statements regarding petitioner's participation in, and knowledge of, the murder were not against Omar's penal interest and were not corroborated for trustworthiness---in fact, they contradicted the identical accounts of two eyewitnesses who testified about the circumstances of the shooting.

## III.    **Sentencing and Motion for Reconsideration**

On June 10, 2003, this court sentenced petitioner to two concurrent terms of life imprisonment for his murder for hire and murder-for-hire conspiracy convictions and a consecutive five-year term of imprisonment for his firearm conviction. Tr. of Sentencing, United States v. Quadar, No. 00-CR-603 (ARR), DE #91, at 11, 13. Immediately prior to sentencing, this court addressed petitioner's motion, which had been filed the day before, requesting reconsideration of the Rule 33 motion on the basis of two additional declarations from Gulzamir

5

Ahmed, apparently a family friend, and Malik Camron Nasir,[2] petitioner's relative, claiming that petitioner was not involved in the murder.[3]

In his declaration, which is the only one of these two now attached to Qadar's instant petition, Gulzamir Ahmed stated that, on a visit to Pakistan in 1999, Rahmet had told Gulzamir Ahmed that it had been Rahmet's intention to use petitioner as bait to lure Shaukat out for Omar to kill him. DE #19-1, ¶¶ 15, 17. According to Gulzamir Ahmed, "[Rahmet] said he had spoken to [petitioner] a few times on the telephone trying to get him to go to New York so that Omar can get a clear shot at [Shaukat]." Id. ¶ 16. Gulzamir Ahmed also stated that Rahmet had told him that he had asked petitioner to go to New York to help him handle the situation and that petitioner did not know that Omar was going to kill Shaukat until it happened. Id. ¶ 17. Gulzamir Ahmed, who was also located in the United Kingdom but expressed his willingness to testify, stated that he had not previously come forward because he "had faith in the Legal System of a county [sic] like the USA." Id. ¶ 18.

Although petitioner has not submitted Nasir's declaration in connection with his petition, the transcript of petitioner's sentencing describes some of its content. Nasir apparently stated that petitioner was at some point held hostage in Pakistan by the Malik family for four months and that she had heard that Rahmet had told petitioner that he would pay for his plane ticket to the United States, which directly contradicted the statement in Raqia's affidavit. Tr. 5.

This court denied petitioner's request for reconsideration of his Rule 33 motion for substantially the same reasons as stated in the initial order denying the motion, and principally on

---

[2] Documents from petitioner's underlying criminal case refer to her as Malik Camron Nasir, but petitioner's papers refer to her as Malik Camron Neyes. For simplicity, the court will use Nasir.

[3] Petitioner also relies on this evidence in his instant petition. However, he has only attached the declaration of Gulzamir Ahmed to the petition. Although he cites the declaration of Malik Camron Nasir (or Neyes) in his "Supplemental/Amended Motion," DE #19, at 19, he has not attached it to the petition.

the grounds that the purportedly exculpatory statements were composed entirely of inadmissible hearsay. Tr. 8-9. The court also noted that "the first set of affidavits [submitted with the Rule 33 motion] . . . was basically inconsistent with the second set of affidavits," id. at 7, and that they were "inherently incredible," id. at 9.

## IV.   **Direct Appeal**

Petitioner appealed his conviction and sentence arguing, through counsel, that (1) there was insufficient evidence to convict him; (2) his sentence exceed the statutory maximum; and (3) his sentence violated the holding of Apprendi v. New Jersey, 530 U.S. 466 (2000). On March 16, 2007, the Second Circuit summarily affirmed petitioner's conviction and sentence and rejected each of his arguments. United States v. Quadar, 223 F. App'x 22 (2d Cir. 2007). The Supreme Court denied Qadar's petition for certiorari on October 1, 2007. Qadar v. United States, 552 U.S. 870 (2007).

## V.   **The Instant Petition**

On May 7, 2013, acting pro se, petitioner filed a "writ of error audita querrla [sic]" pursuant to the All Writs Act, 28 U.S.C. § 1651, which Qadar explicitly indicated was not intended to serve as a § 2255 petition. DE #1. This court denied that petition on June 5, 2013, and gave petitioner 30 days to file a petition pursuant to § 2255. DE #5. Because petitioner had not submitted a § 2255 petition with the 30-day period, judgment was entered dismissing his case on July 8, 2013. DE #7. On August 7, 2013, petitioner filed a motion seeking reconsideration and additional time to file his § 2255 petition, DE #8, which the court granted, DE #9.

7

On September 30, 2013, the court received Qadar's § 2255 petition.[4] DE #10 ("Initial Petition). In his Initial Petition, Qadar argued that his trial counsel was ineffective for, among other things, (1) advising him to proceed to trial rather than plead guilty; (2) failing to relay to petitioner a 240-month plea offer; and (3) advising petitioner to appear before the jury in full beard and Islamic attire at a time that was only a few months after the 9/11 terrorist attacks in New York City. Qadar contended that "ineffective counsel while being presumed innocent makes petitioner still actually innocent." Id. at ECF 15.

Qadar subsequently moved to "amend/correct/supplement" his petition, DE #12, and his "Amended/Supplemental" petition was filed on February 14, 2014, DE #19 ("Amend. Pet."). In his Amended Petition, Qadar principally argued that he was actually innocent based on the insufficiency of the evidence at trial and on the "new evidence," i.e., the four declarations that were submitted in connection with his Rule 33 and reconsideration motions. Petitioner also argued that his trial counsel's failure to investigate or call these new potential witnesses who provided the affidavits constituted ineffective assistance of counsel. In support of his arguments, he attached as exhibits the earlier declarations from Nishat, Raqia, and Gulzamir Ahmed. He argued that, although filed after the expiration of the one-year statute of limitations, his petition should not be treated as time-barred because the new evidence demonstrates his actual innocence.

Having granted petitioner generous extensions of time to file a reply to the government's opposition papers and not having received a reply from petitioner in a timely fashion, the court issued an order on July 23, 2014, denying Qadar's petition as time-barred. DE #28. That same

---

[4] Qadar's petition was attached to a letter from a correctional counselor at the facility where petitioner was incarcerated indicating that petitioner had tried to mail the petition on August 28, 2013, but it had been returned as undeliverable.

day, chambers became aware of Qadar's reply, which had arguably been received in a timely fashion, but which had not been transmitted to chambers until a week after its receipt due to bureaucratic oversight. Accordingly, the court vacated its prior order and judgment dismissing the petition. DE ##30 and 33.

In his reply, petitioner raises, for the first time, the argument that tolling should apply to render his petition timely because, he asserts, he has been diligently pursuing his rights. According to petitioner, following the Supreme Court's denial of a writ of certiorari in 2007 on his direct appeal, his appellate counsel, Saghir, informed Qadar's family of her intention to keep working on the case and to look into filing motions for post-conviction relief. Reply, DE #27, at 3. He asserts that Saghir told him and his family not to file any motions in federal court because she was taking care of them and that Saghir continued to communicate with his family approximately every two months, for some unspecified period of time, to tell them that she was continuing to work on his case. Id. at 4. According to petitioner, it was his "belief" that Saghir was going to file a § 2255 petition on his behalf. Id. Petitioner states that, in approximately October 2012, his family learned that Saghir had been disbarred in 2009.[5] Id. After becoming aware of Saghir's disbarment, petitioner learned of a "paralegal" from another inmate who he thought could be helpful to him. Id. Qadar's familyy paid $5000 to "Mr. Abdul Qawi/'Raw Law', Legal Representative" as a retainer to represent him, and Qadar asserts that it was Mr. Abdul Qawi who erroneously filed the writ of audita querela on petitioner's behalf that began this proceeding. Id. at 4-5. According to Qadar, Mr. Abdul Qawi was in fact an individual named Leslie Love, who was arrested at some point after being retained by Qadar. Id. Qadar

---

[5] Saghir was in fact disbarred in the Second Circuit on February 18, 2010, under the reciprocal discipline rule following her disbarment by the United States District Court for the Southern District of New York in 2009. In re Saghir, 595 F.3d 472 (2d Cir. 2010).

argues that these circumstances, combined with his inability to afford other counsel, warrant tolling of the statute of limitations for his petition.

In his reply, as well as in several of his other copious filings with the court, petitioner attempts to pick apart the evidence offered against him at trial and by the government in opposition to his petition. His assertions may be construed as going to his claims for ineffective assistance of counsel, sufficiency of the evidence, and actual innocence. He also asserts that the Supreme Court's recent decision in <u>Rosemond v. United States</u>, 134 S. Ct. 1240 (2014), somehow affects his firearm conviction under 18 U.S.C. § 924(c). The government has addressed the impact, if any, of this case in a supplemental response. DE #35.

## DISCUSSION

## I.    <u>Statute of Limitations</u>

A federal habeas petition is subject to a one-year statute of limitations, which begins to run on "the date on which the judgment of conviction becomes final."[6] 28 U.S.C. § 2255(f). "[A] prisoner's conviction becomes final . . . when the United States Supreme Court denies the prisoner's petition for a writ of <u>certiorari</u>." <u>Green v. United States</u>, 260 F.3d 78, 84 (2d Cir. 2001); <u>accord</u> <u>Clay v. United States</u>, 537 U.S. 522, 527 (2003).

---

[6] The statute of limitations will also run from, if later, "(2) the date on which the impediment for making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action; (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2255(f). There is no basis for ground (2) to apply here. To the extent petitioner argues that he has a claim under <u>Rosemond v. United States</u>, 134 S. Ct. 1240 (2014), that would involve the application of ground (3), that ground is of no avail because, as discussed below, petitioner's <u>Rosemond</u> claim lacks merit. To the extent that plaintiff brings his petition based on the "new evidence" of the affidavits, those facts were available to petitioner at the latest by the time of his sentencing when they were provided to the court. Accordingly, ground (4) is of no help to petitioner, as his conviction did not become final until after the date on which he was aware of the evidence underlying his petition.

The Supreme Court denied Qadar's petition for certiorari on October 1, 2007. Even the earliest conceivable date on which Qadar might be considered to have filed his § 2255 petition, the date on which he filed his petition for a writ of audita querela, was not until well over five years later. Accordingly, in the absence of circumstances warranting tolling or some other exception to the one-year limitations period, the petition must be dismissed as untimely.

## A.    *Actual Innocence*

Qadar's first assay on the statute of limitations is his asserted innocence. In his Amended Petition, Qadar asserts that he is actually innocent of the crimes of which he was convicted. Consequently, he argues that, pursuant to the Supreme Court's decision in McQuiggin v. Perkins, 133 S. Ct. 1924 (2013), his petition should not be barred as untimely. Although a showing of "actual innocence" may open a "gateway" to consideration of an otherwise time-barred habeas petition, id. at 1928, petitioner has not met the "demanding" standard for such a showing in this case, House v. Bell, 547 U.S. 518, 538 (2006).

In McQuiggin, the Supreme Court recognized that the actual innocence gateway to federal habeas review developed in Schlup v. Delo, 513 U.S. 298 (1995), and House, 547 U.S. 518, extends to cases where the petition would otherwise be barred by the expiration of the one-year statute of limitations prescribed by the Antiterrorism and Effective Death Penalty Act of 1998 ("AEDPA").[7] This "miscarriage of justice" exception applies only to cases "where a constitutional violation has probably resulted in the conviction of one who is actually innocent."

---

[7] The Second Circuit had previously reached the same conclusion in Rivas v. Fischer, 687 F.3d 514, 540, 548 (2d Cir. 2012). McQuiggin and Rivas considered the statute of limitations in 28 U.S.C. § 2241(d)(1), which applies to habeas petitions filed by state prisoners. Because the limitations language of 28 U.S.C. § 2255(f) is nearly identical and the reasoning of those cases is equally applicable in this context, the court assumes that the actual innocence exception would be available to a § 2255 petitioner who satisfies its stringent standard. Cf. Bousley v. United States, 523 U.S. 614, 623 (1998) (holding that a § 2255 petitioner who has procedurally defaulted a claim by failing to raise it on direct review may raise that claim in his habeas petition if he can first demonstrate that he is "actually innocent").

Rivas v. Fischer, 687 F.3d 514, 540 (2d Cir. 2012) (quoting Murray v. Carrier, 477 U.S. 478, 496 (1986)). In McQuiggin, the Supreme Court cautioned that "tenable actual-innocence gateway pleas are rare." 133 S. Ct. at 1928. "The gateway should open only when a petition presents 'evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.'" Id. at 1936 (quoting Schlup, 513 U.S. at 316).

To meet this stringent standard, a petitioner's claim of actual innocence "must be both 'credible' and 'compelling.'" Rivas, 687 F.3d at 541 (quoting House, 547 U.S. at 521, 538). "For the claim to be 'credible,' it must be supported by new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence--- that was not presented at trial." Id. (internal quotation marks and citation omitted). "For the claim to be 'compelling,' the petitioner must demonstrate that 'more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt---or to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt.'" Id. (quoting House, 547 U.S. at 538). A petitioner must at least "introduce credible new evidence that thoroughly undermines the evidence supporting the jury's verdict." Id. at 543.

In applying this standard, courts must "consider all the evidence, old and new, incriminating and exculpatory" and "make a probabilistic determination about what reasonable, properly instructed jurors would do." House, 547 U.S. at 538 (internal quotation marks omitted). "If new evidence so requires, this may include consideration of the credibility of the witnesses presented at trial." Id. at 538-39 (internal quotation marks omitted). The court must consider all new evidence, both admissible and inadmissible, "in light of the pre-existing evidence in the

record." Doe v. Menefee, 391 F.3d 147, 161 (2d Cir. 2004). "As to new witness testimony in particular, the court considers the potential motives to be untruthful that the witness may possess, corroboration or the lack thereof, internal inconsistency, and the inferences or presumption that crediting particular testimony would require." Lopez v. Miller, 915 F. Supp. 2d 373, 401 (E.D.N.Y. 2013) (internal quotation marks and alteration omitted). A court may also consider "[u]nexplained delay in presenting new evidence" as a factor in making its determination. McQuiggin, 133 S. Ct. at 1935.

Here, having reviewed the record as a whole, including the declarations resubmitted by petitioner, the court finds petitioner's actual innocence claim neither credible nor compelling. Foremost, the "new" evidence relied on by Qadar is not the kind of "new reliable evidence" required to make a viable showing of credibility. As discussed in this court's prior rulings related to petitioner's Rule 33 motion, the exculpatory portions of the "new" declarations consist of hearsay statements lacking in indicia of reliability. These are not "trustworthy eyewitness accounts" or firsthand alibi witnesses. Although signed and dated, none of the declarations are sworn or notarized. The fact that petitioner's "new evidence" consists entirely of hearsay statements may not, alone, be determinative, but it is a factor that weighs against the reliability of the evidence.

In addition to primarily containing hearsay, the timing of these affidavits is highly suspect. Despite petitioner arguably having had ample opportunity to investigate any information that these witnesses had prior to trial, all four declarations were provided only after petitioner was convicted, and the second set only after this court made a ruling unfavorable to petitioner. Moreover, the facts in the second set of affidavits were neatly tailored to address precisely the issues that the court had raised with respect to the first set of affidavits. The

declarants' purported reasons for failing to come forward sooner range from mildly plausible---fear of the Malik family that was only overcome after petitioner's conviction---to completely feckless---"faith in the Legal System of a county [sic] like the USA."

Not only are these affidavits inconsistent with each other, they are, more importantly, inconsistent with the sworn testimony at trial of two independent eyewitnesses who saw two persons acting together to kill Shaukat and with the corroborating circumstantial evidence adduced by the government. The eyewitness testimony that one individual drove the car chasing after Shaukat while the other individual shot at Shaukat from the passenger side of the vehicle is nearly impossible to reconcile with a version of events in which petitioner was merely a bystander, present only to play a mediation role, without any knowledge of, or active role in, the murder of Shaukat. The two eyewitnesses' version of events is also inconsistent with the account that Omar purportedly gave to Nishat and Raqia, in which Qadar stood by passively while Omar drew his weapon in panic and impulsively shot Shaukat. As this court stated in its Rule 33 denial order, "the fact that [these statements] have no support in the record casts fatal doubt on their reliability." United States v. Quadar, No. 00-CR-603 (ARR), DE #88, at 10.

With respect to the second prong of the actual innocence analysis, even assuming that petitioner's asserted evidence were new, credible, and could be admissible at trial, it is not so compelling as to lead to the conclusion that "more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt." House, 547 U.S. at 538. As already explained, the additional declarations are inconsistent with the more reliable firsthand accounts of eyewitnesses to Shaukat's murder who, unlike Qadar's family friends and relatives, are less likely to have motives for their accounts. Moreover, those eyewitnesses' accounts are corroborated by circumstantial evidence offered against petitioner at trial, including petitioner's

14

overnight retreat to Virginia with Omar, his attempts to hide his trip to the United States from his family as well as from authorities, his flight from the United Kingdom to the Netherlands, and his recorded conversation with his wife about money that he had received in 1996 that he did not want others to know about. Although the court acknowledges the seeming unfairness of only petitioner's incarceration while the ostensibly more culpable parties, Rahmet and Omar, still remain free and at large, petitioner's proffered evidence is simply not so compelling as to undermine the court's confidence in the outcome of the trial and suggest that a fundamental miscarriage of justice will be worked if his habeas petition is dismissed as time-barred.

Accordingly, the actual innocence exception is inapplicable in petitioner's case.

## B.    *Equitable Tolling for Attorney Neglect*

In his reply, petitioner also argues that equitable tolling should apply because of the circumstances in which he relied on the advice of his now-disbarred counsel and a now-incarcerated "legal representative." Only "rare and exceptional circumstances warrant equitably tolling the limitations period" for a § 2255 petition. Green, 260 F.3d at 82-83 (internal quotation marks omitted). A habeas petitioner is "entitled to equitable tolling only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." Holland v. Florida, 560 U.S. 631, 649 (2010) (quoting Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005)) (internal quotation marks omitted).

In this instance, petitioner's allegation that Saghir continued to tell Qadar that she was working on his case and that he should not take any action, when in fact she was not proceeding with his case, raises very serious concerns, particularly in light of the fact that Saghir's disbarment related to her neglect of numerous other criminal cases. See In re Saghir, 595 F.3d

472, Appendix 1 (2d Cir. 2010). Where a petitioner or his representatives have specifically directed counsel to file a § 2255 motion and counsel has failed to do so, while making misrepresentations to the client, such egregious conduct may constitute "extraordinary" circumstances warranting equitable tolling. See Baldayaque v. United States, 338 F.3d 145 (2d Cir. 2003). However, a petitioner must nonetheless demonstrate that "he acted with reasonable diligence in attempting to file his federal habeas petition during the period that he seeks to toll." Menefee, 391 F.3d at 175. The Second Circuit explained the "reasonable diligence" requirement in Menefee:

> In other words, the act of retaining an attorney does not absolve the petitioner of his responsibility for overseeing the attorney's conduct or the preparation of the petition. Particularly because petitioners often are fully capable of preparing and filing their habeas petitions pro se, and pro se status does not in itself constitute an extraordinary circumstance meriting tolling, it would be inequitable to require less diligence from petitioners who are able to hire attorneys than from those who are forced to proceed pro se. In the attorney incompetence context, therefore, the reasonable diligence inquiry focuses on the purpose for which the petitioner retained the lawyer, his ability to evaluate the lawyer's performance, his financial and logistical ability to consult other lawyers or obtain new representation, and his ability to comprehend legal materials and file the petition on his own.

Id. (internal citations omitted).

In this case, petitioner has not shown that he exercised reasonable diligence during the period that he seeks to toll. First, although petitioner states that he understood Saghir to be working on post-conviction relief motions, he does not say that he retained her specifically for that purpose or that he ever specifically directed her to file a § 2255 petition. More significantly, although petitioner asserts that Saghir contacted his family approximately every two months for some unspecified period after his petition for certiorari was denied in 2007, he does not explain what efforts he made to follow up with Saghir or how, despite his asserted diligence, he failed to become aware that she had been disbarred by early 2010 until he learned of it October 2012, at

16

which time he was unable to locate her. It seems highly improbable that petitioner would, while acting diligently, let five years pass before becoming concerned about the deadline for his § 2255 filing or beginning to question the efforts of his counsel over that extended period of time. "Given that we expect pro se petitioners to know when the limitations period expires and to understand the need to file a [] post-conviction motion within that limitations period," Menefee, 391 F.3d at 177, it would be nearly impossible to find that Qadar acted with reasonable diligence despite seemingly failing to make diligent inquiry of his counsel as to when his § 2255 petition had been or would be filed. However, the court does take into account that petitioner may have lacked complete mastery of the English language, knowledge of the legal system, or financial resources such as to have advantaged him in overseeing his lawyer's work or in submitting his own petition pro se.[8] See Baldayaque, 338 F.3d at 153 (noting that petitioner's circumstances--- particularly, his difficulties in English, his lack of education, and his inability to raise funds for a laywer---may be relevant to reasonable diligence inquiry). Even so, the court would be hard pressed to find reasonable diligence here. Regardless, a hearing is not necessary to address the applicability of equitable tolling because, even were the court to consider the petition timely, the petition must nonetheless fail on the merits.

## II.    **Sufficiency of the Evidence and Actual Innocence**

Petitioner's claims that the evidence at trial was insufficient to convict him and that he is actually innocent of the crimes for which he was convicted must be summarily dismissed as without merit. To the extent that petitioner challenges the sufficiency of the evidence against him at trial, that claim has already been rejected by the Second Circuit. United States v. Quadar,

---

[8] The court notes that Qadar's family did apparently have sufficient funds at their disposal to hire a "Legal Representative" on retainer, so it is not clear to what extent he may have had difficulty affording another lawyer.

223 F. App'x at 24-25. "It is well settled that 'section 2255 may not be employed to relitigate questions which were raised and considered on direct appeal.'" Barnett v. United States, 870 F. Supp. 1197, 1201 (S.D.N.Y. 1994) (quoting Cabrera v. United States, 972 F.2d 23, 25 (2d Cir. 1992)). As to petitioner's "actual innocence" claim, the court notes that the Supreme Court has yet to rule on whether a freestanding innocence claim can be a ground for habeas relief. House, 547 U.S. at 554-55. Nonetheless, even was such a freestanding claim available, the burden for such a hypothetical claim has been described as "extraordinarily high." Id. at 555 (quoting Herrera v. Collins, 506 U.S. 390, 417 (1993)). For the reasons set forth above, petitioner has not satisfied even the standard for actual innocence sufficient to invoke an exception to the procedural bar to a petition. Thus, these two claims must fail.

## III.    Ineffective Assistance of Counsel

Construing the petition liberally, Qadar argues that his trial counsel, Schacht, was ineffective primarily for (1) advising him to proceed to trial rather than plead guilty when petitioner himself wished to plead guilty; (2) failing to relay to petitioner a plea offer for a sentence that was shorter than the one that he ultimately received; (3) advising petitioner to appear before the jury in full beard and Islamic attire at a time that was only a few months after the 9/11 terrorist attacks in New York City; (4) failing to locate and procure as witnesses the individuals whose declarations he offered in his Rule 33 motions and again, here, as "new evidence"; and (5) failing to challenge his extradition.[9]

---

[9] To the extent that plaintiff also seeks to make an ineffective assistance of counsel claim on the grounds that trial counsel somehow failed to challenge the 18 U.S.C. § 924(c) count under Bailey v. United States, 516 U.S. 137 (1995), that claim is rejected as meritless for substantially the reasons outlined by the government in its memorandum. Mem. of Law in Opp'n to Pet. under 28 U.S.C. § 2255, DE #24, at 43.

A petitioner seeking a writ of habeas corpus on ineffective assistance of counsel grounds faces a heavy burden in establishing entitlement to relief. Strickland v. Washington, 466 U.S. 668 (1984), established a two-prong test by which ineffective assistance of counsel claims are adjudicated. Under Strickland, a petitioner must demonstrate, first, that counsel's performance fell below "an objective standard of reasonableness" under "prevailing professional norms," id. at 688, and second, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," id. at 694. A court need not decide both prongs of the Strickland test if there is an insufficient showing on one. See id. at 697. Moreover, "[t]he performance inquiry is contextual; it asks whether defense counsel's actions were objectively reasonable considering all the circumstances." Purdy v. United States, 208 F.3d 41, 44 (2d Cir. 2000). Applying the Strickland standard to each of petitioner's claims, the court concludes that none of these claims are meritorious.

## A.    *Plea Negotiations*

Petitioner claims that his trial counsel provided him with constitutionally substandard representation prior to trial because counsel (1) misadvised him to go to trial rather than plead guilty when he wished to do so sometime in 2002 and (2) failed to relay a plea offer to petitioner. Pertinent to these claims, the Supreme Court has held that the Sixth Amendment right to counsel "extends to the plea-bargaining process." Lafler v. Cooper, 132 S. Ct. 1376, 1384 (2012). As part of this process, counsel must inform a client of the terms of a plea offer and give advice to a client considering whether to accept a plea offer. Purdy, 208 F.3d at 45. "[A]s a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." Missouri v. Frye, 132 S. Ct. 1399, 1408 (2012). Counsel should "usually inform the defendant of the strengths and

weaknesses of the case against him, as well as the alternative sentences to which he will most likely be exposed." Purdy, 208 F.3d at 45. Ultimately, however, it is the client's decision whether to accept a plea offer, and counsel may not coerce a client to accept or reject such an offer. Id. If counsel permits "the offer to expire without advising the defendant or allowing him to consider it, defense counsel [does] not render the effective assistance the Constitution requires." Frye, 132 S. Ct. at 1408. To succeed on such a claim as that asserted here, a petitioner must establish that he would have accepted an earlier plea offer, that the result would have been more favorable to him, and that there was a reasonable probability that neither the prosecution not the trial court would have prevented the plea offer from being implemented. Id. at 1409.

In connection with this proceeding, the government submitted an affidavit from petitioner's trial counsel, Schacht, denying that he ever failed to convey a plea offer or acted in spite of petitioner's desire to plead guilty. Affirmation of Alexei Schacht, Esq. ("Schacht Affirmation"), DE #24, Ex. A. In his submission, Schacht affirms that he "[a]t no time . . . fail[ed] to convey to [Qadar] a formal plea offer from the government" and that, contrary to petitioner's assertions, Schacht "was never 'instructed' by [Qadar] to enter a guilty plea." Id. ¶ 3. Schacht states: "Indeed, during my frequent discussions with the defendant, he always maintained his innocence." Id.

The government has also submitted an affirmation from Samantha Schreiber, one of the Assistant United States Attorneys who prosecuted petitioner's case. Affirmation of Samantha L. Schreiber, DE #24, Ex. B. Schreiber confirms that, during plea negotiations, Qadar's counsel told her that Qadar "expressed his innocence and was unlikely to plead guilty." Id. ¶ 3. She indicates her recollection that a plea agreement involving a 240-month sentence was advance by

the government and confirms that "[d]efense counsel stated that he needed to confer with his client, who was incarcerated at the time, regarding the offer." Id. ¶ 4. She recalls being made aware shortly thereafter that defense counsel had discussed the offer with Qadar and that Qadar had declined it. Id.

The court credits Schacht's and Schreiber's accounts of the plea negotiations over petitioner's self-serving and unsupported assertions, and therefore determines that an evidentiary hearing is not necessary. See Chang v. United States, 250 F.3d 79, 85-86 (2d Cir. 2001) (finding that a hearing was not required where the court found defense counsel's detailed affidavit more credible than petitioner's contradictory "self-serving and improbable assertions"); Aessa v. Annets, No. 06-CV-5830 (ARR), 2009 WL 1636251, at *8 (E.D.N.Y. June 10, 2009) ("Absent credible evidence to the contrary, this court credits [defense counsel's] affirmation" regarding advice whether to plead guilty). With regard to petitioner's assertion that he was never informed of a 240-month plea offer, petitioner does not explain how he nonetheless managed to learn of this offer, which only further undermines his credibility and reinforces the court's determination. The court finds that Qadar at all times pre-trial maintained his innocence, as he still does in this proceeding, and that his trial counsel at no point failed to implement an instruction from Qadar to enter a guilty plea. Schacht relayed information about a possible plea offer to Qadar and declined it only upon Qadar's direction.

Moreover, to make the required showing of prejudice, petitioner "must show the outcome of the plea process would have been different with competent advice." Lafler, 132 S. Ct. at 1384. Petitioner has submitted nothing but his own post facto self-serving statements to substantiate his assertion that he would actually have accepted a plea offer. In light of his counsel's credible statements, as well petitioner's own ongoing insistence on his innocence

21

throughout every stage of the proceedings from Rule 33 motions to direct appeal to habeas, the court cannot find petitioner's claims credible. See Purdy v. Zeldes, 337 F.3d 253, 259 (2d Cir. 2003).

Accordingly, petitioner's ineffective-assistance-of-counsel claims related to his counsel's alleged failures during the plea negotiation phase are meritless.

### B.    *Petitioner's Trial Attire*

Petitioner next makes the unsupported assertion that his counsel advised him not to shave his beard and to wear full Islamic attire at his criminal trial, which petitioner asserts resulted in prejudice to him because of anti-Muslim sentiment prevailing in the aftermath of the September 11, 2001, terrorist attacks. Petitioner's claim directly contradicts his trial counsel's affirmation, which states that Schacht "was worried about anti-Muslim prejudice on the jury in the aftermath of the September 11, 2001 attacks and asked [Qadar] and his family to dress in less identifiable Muslim-style clothing. . . . [Qadar] would not even discuss my suggestions." Schacht Affirmation ¶ 4. The court again finds petitioner's self-serving assertions wholly incredible, particularly in light of their refutation by counsel.

Moreover, the court agrees with the government that, as more fully discussed in the government's brief, Estelle v. Williams, 425 U.S. 501 (1976), and its progeny, which deal with defendants who have been forced to wear prison clothing during trial, are not analogous to petitioner's circumstances where he himself acknowledges that he was dressed in civilian garb. Civilian clothing, be it Muslim or otherwise, cannot raise the same fair trial concerns as prison clothing because it does not implicate the presumption of innocence owed to the defendant. Any prejudice implicated here is of a wholly different nature, and even hypothetical advice to wear

22

petitioner's traditional Muslim attire, which the court does not believe counsel gave, is not outside the presumption that counsel's advice fell "within the wide range of reasonable professional assistance" and "sound trial strategy." Strickland, 466 U.S. at 689.

## C. *Presentation of Additional Witnesses*

Petitioner appears to argue that counsel was ineffective for failing to locate and subpoena the four witnesses whose declarations petitioner submitted in conjunction with his Rule 33 motions and again in this proceeding as "new evidence." As noted by the government, petitioner's assertion that his trial counsel should have located and called these witnesses directly contradicts his argument elsewhere in his Rule 33 motion and in making his actual innocence claim in this proceeding that the affidavits from these individuals constituted "new evidence" because the defense could not have, through the exercise of due diligence, known of the existence of such evidence prior to or during trial.

More significantly, a court reviewing a Strickland claim is "especially deferential to defense attorneys' decisions concerning which witnesses to put before the jury" because such decisions are "typically a question of trial strategy that [reviewing] courts are ill-suited to second-guess." Greiner v. Wells, 417 F.3d 305, 323 (2d Cir. 2005) (internal quotation marks and citation omitted); see also United States v. Best, 219 F.3d 192, 201 (2d Cir. 2000) ("[C]ounsel's decision as to whether to call specific witnesses—even ones that might offer exculpatory evidence—is ordinarily not viewed as a lapse in professional representation.") (internal quotation marks omitted). As discussed above and in this court's decisions on petitioner's Rule 33 and reconsideration motions, the court finds the statements in the four new declarations submitted by petitioner highly incredible due to their hearsay nature as well as their internal and external

contradictions with the material in the record. It, thus, appears entirely reasonable that, even had

trial counsel been aware of these individuals prior to trial, he would concluded that the

inconsistencies in their testimony would have proven more harmful than helpful to petitioner's

case. Moreover, as the court discussed in its ruling on the Rule 33 and reconsideration motions,

the purportedly exculpatory content of the declarations consists entirely of hearsay, and

petitioner cannot show how he could have been prejudiced by trial counsel's hypothetical failure

to locate and subpoena witnesses whose exculpatory testimony would have been inadmissible.

Petitioner has not shown that there is a "reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different," Strickland, 466

U.S. at 694, and this claim must be dismissed.

### D. *Failure to Challenge Extradition*

To the extent Qadar seeks to argue that his trial counsel was ineffective for failing to

challenge Qadar's extradition to the United States on the grounds that the extradition document

did not specifically state that he was charged with conspiracy, this claim necessarily fails

because, as Qadar admits in his Amended Petition, he "willingly waived extradition

proceedings" in the United Kingdom, Amend. Pet. at 3, and was voluntarily brought to the

United States. See United States v. Vega, 07-CR-0707 (ARR), 2012 WL 1925876, at *8

(E.D.N.Y. May 24, 2012) (citing United States v. Herbert, 313 F. Supp. 2d 324 (S.D.N.Y. 2004))

(counsel's failure to pursue meritless claim relating to lack of jurisdiction not ineffective

assistance); Herbert, 313 F. Supp. 2d at 331 (finding that, notwithstanding an extradition request,

defendant was not "extradited" pursuant to treaty where he was actually voluntarily transferred

by the requested country).

## IV.    **Impact of *Rosemond***

In his filings, petitioner suggests that the Supreme Court's recent ruling in Rosemond

somehow negates the validity of his conviction on the firearm count under 18 U.S.C. § 924(c).

However, Second Circuit law at the time of petitioner's conviction was consistent with the

Supreme Court's holding in Rosemond that, with respect to the intent element of an aiding and

abetting claim in the context of a § 924(c) offense, "defendant's knowledge of a firearm must be

advance knowledge---or otherwise said, knowledge that enables him to make the relevant legal

(and indeed, moral) choice." Rosemond, 134 S. Ct. at 1249.  The charge given in petitioner's

case more than sufficiently met this standard by instructing the jury:

> In order to convict a defendant of aiding and abetting and use of a firearm, it is
> also not enough to find that the defendant performed an act to facilitate or
> encourage the commission of the underlying crime of violence with only the
> knowledge that a firearm would be used in the commission of that crime.  Instead,
> you must find that the defendant performed some act that facilitated or
> encouraged the actual using of the firearm in relation to the underlying crime.

Trial Tr., DE #35, Ex. A, at 898.  This charge went beyond the requirement of Rosemond, and

the Second Circuit has found the import of such a charge to be consistent with the holding in that

case. [10]  See United States v. Young, 561 F. App'x 85, 92 (2d Cir. 2014) ("By finding that

[defendant] encouraged the 'actual using, carrying of, or possession' of a firearm in the [charged]

robbery, the jury necessarily also had to find that he had advance knowledge of the firearm-

related conduct, consistent with the Supreme Court's explication in Rosemond.").  Accordingly,

petitioner's Rosemond claim is without merit.[11]

---

[10] Any error was likely harmless in any event because the court also gave a separate charge as to a theory of liability under Pinkerton v. United States, 328 U.S. 640 (1946), and there was evidence in the record to support liability under that doctrine.  See Young, 561 F. App'x at 92 (finding any error in aiding and abetting charge harmless because ample evidence supported defendant's liability under Pinkerton).

[11] Such claim, even if valid, would also be without effect on his sentence.  See United States v. Nieves, 354 F.

**CONCLUSION**

For the foregoing reasons, petitioner's motion to vacate his conviction and sentence under 28 U.S.C. § 2255 is denied. Furthermore, because petitioner has not made a "substantial showing of the denial of a constitutional right" pursuant to 29 U.S.C. § 2253(c)(3), no Certificate of Appealability will issue. Petitioner may seek such a certificate from the Second Circuit Court of Appeals. The Clerk of Court is directed to enter judgment accordingly.

SO ORDERED.

s/Allyne R. Ross

_____
Allyne R. Ross
United States District Judge

Dated:      August 7, 2014
             Brooklyn, New York

---

App'x 547, 554 (2d Cir. 2009) (potentially erroneous sentence imposed under § 924(c) harmless because irrelevant to time defendant would serve in prison where defendant had been sentenced to mandatory life imprisonment for other charged offense).

## SERVICE LIST

**Manzoor Qadar**
# 60674-053
FCI Otisville
P.O. Box 1000
Otisville, NY 10963